**KEYSTONE INSURANCE COMPANY**

v.

**Constance B. FOSTER, Insurance Commissioner of the Commonwealth of Pennsylvania.**

**Civ. A. No. 90-0914.**

United States District Court,
E.D. Pennsylvania.

Feb. 16, 1990.

Jeffrey A. Less, Bazelon & Less, Philadelphia, Pa., for plaintiff.

James J. Haggerty, Richard D. Spiegelman, William W. Warren, Jr., Gregory E. Dunlap, Office of Gen. Counsel, Harrisburg, Pa., for defendant.

## MEMORANDUM

LUDWIG, District Judge.

On February 8, 1990 plaintiff Keystone Insurance Company filed this action in an attempt to preserve the economic benefit of the motor vehicle insurance rate increases it had received just three days earlier from Pennsylvania's Insurance Commissioner, defendant Constance B. Foster.[1] The complaint asks the court to enjoin the nullification of that rate increase—together with the utilization of the prior rate as a base line for reductions in premium as of July 1, 1990, with no increment before July 1, 1991 —resulting from Pennsylvania's enactment on February 7, 1990 of Act 6 of 1990.[2] The legal basis asserted for the injunction is that the new insurance act will have a confiscatory effect on Keystone's insurance business—amounting to a taking of property without due process of law, in violation of the Fifth and Fourteenth Amendments to the United States Constitution.[3] Jurisdiction is federal question. 28 U.S.C. § 1331.

---

1. The averaged rate increases were 14.7 percent.

2. Codified as amendments to Pennsylvania's Consolidated Statutes. Act 6 rolls back insurance rates to December 1, 1989. 75 Pa.C.S.A. § 1799.7(b)(2) & (d).

3. The complaint also alleges violations of the Pennsylvania Constitution, Article I, sections one, nine and 10, but these claims run afoul of the doctrine of sovereign immunity, *see Pennhurst State School & Hospital v. Halderman,* 465

On February 12, 1990 a hearing was held on Keystone's motion for a preliminary injunction.[4] Keystone's witnesses were it senior vice-president and an actuarial consultant. The deputy insurance commissioner for rates and policy regulation, a statistician, testified for defendant.

Act 6 of 1990 is a major departure in Pennsylvania's approach to the problems of motor vehicle insurance. Various proposals having been considered over a number of years by the General Assembly, Act 6 was occasioned largely by the increasingly high cost of automobile insurance coverage for residents of Philadelphia. *See* debate, Senate of Pennsylvania on the Conference Report, Feb. 7, 1990. While the breadth of the law is demonstrated by its significantly amending Pennsylvania Consolidated Statutes title 18 Crimes and Offenses, title 42 Judiciary and Judicial Procedures, and title 75 Vehicles, its chief economy feature for consumers is its July 1, 1990 premium reduction of 10 percent with an elective additional 12 percent for a waiver of right to sue except for serious injuries—the so-called "verbal threshold" or "limited tort option" available to policy holders. Both are minimum reductions, the amounts of which may be increased by the insurance commissioner. 75 Pa.C.S.A. § 1799.7(b)(1) & (2) & (c). Other provisions include a ceiling on medical costs, protections against insurance fraud, lowered minimum first-party coverage from $10,000 to $5,000 and punitive damages against one's insurer for bad faith.

In addition to the rate rollback to December 1, 1989, the Act requires insurers to apply, by May 1, 1990, for new rate approvals, effective July 1, 1990. 75 Pa.C.S.A. § 1799.7(a). There is a "[r]ate freeze after implementation of tort option elections ... between July 1, 1990 and June 30, 1991 [and] between July 1, 1991 and June 30, 1992, [rates] may not be increased over ...

an amount greater than ... the Consumer Price Index (URBAN), the cost of medical care services, the cost of automobile repairs, or other indices of cost increases ... adopted by the commissioner...." 75 Pa. C.S.A. 1799.7(e) & (f).

Act 6 also states—

An insurer aggrieved by the rate reductions mandated by this subsection may seek relief from the commissioner which relief may be granted when the commissioner deems necessary in extraordinary circumstances.

75 Pa.C.S.A. § 1799.7(b)(3).

As to this provision, according to the representation of the Insurance Commissioner's counsel: "[C]onsideration can be given to the adequacy of an insurance company's December 1st, 1989 rate and to all facts that have impacted the insurance company during the hiatus of December 1st, 1989 through July 1st, 1990." N. 301. Furthermore: "[If] a company were to ... demonstrate that they've lost money during the transition, that ... they're still going to have a loss over the 17–month period, the law permits whatever is necessary to avoid a confiscatory rate.... [R]elief would have to be granted even from the December 1, [1989] rate. That's the construction ... that necessarily must be given." N. 207, 209.

Keystone's constitutional challenge focuses on the impact on its business of the rollback of rates to December 1, 1989, the ensuing rate reductions, and the rate increase freeze for some 17 months until July, 1991. Its evidence was that without the 14.7 percent increase it will operate at a loss of $34,490 per day—$12.8 million a year—or a negative return on surplus of 22.4 percent.[5] These figures presuppose that the mandated rate reductions effective this July would be offset by savings for the

---

U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984), and are not pressed by plaintiff.

4. On February 9, 1990 a temporary restraining order was refused. After the hearing on February 12, 1990 Keystone agreed to convert the proceeding to one for final relief, but the Insurance Commissioner was not willing to do so.

5. According to the actuary, Keystone's surplus on December 31, 1989 was $66.4 million. He and the deputy insurance commissioner suggested reasonable rates of return in the industry of 11 to 16 percent.

company. The deputy insurance commissioner, on the other hand, projected that, over the 17–month rate freeze ending July, 1991, Keystone could expect a positive return on surplus of some 16 percent. He ascribed this calculation to economies the insurance company would realize under the new law.

Considering the testimony presented by Keystone and the cross-examination of the deputy commissioner, the weight of the evidence strongly favored plaintiff. Based on this record, there must be considerable skepticism that Keystone will achieve the substantial economies that were described by the deputy commissioner. The contrary evidence from plaintiff's actuary was more plausible, consistent, and probable than that of defendant's witness.

■ Under the Fifth and Fourteenth Amendments, a state must allow a regulated business to obtain a fair return on its property given the risks. *Duquesne Light Company v. Barasch,* 488 U.S. 299, 109 S.Ct. 609, 617, 102 L.Ed.2d 646 (1989).[6] Despite the weaknesses in the Insurance Commissioner's evidence, Act 6 of 1990 overcomes, at least at this juncture, the challenge of unconstitutionality. First, it was not shown that over the initial freeze period of 17 months the Act will necessarily have a confiscating effect. Secondly, there is a constitutional "safety valve" —§ 1799.7(c)—permitting rate relief to be accorded by the insurance commissioner if an insurance company experiences "extraordinary circumstances," including the rate rollback. This provision would enable the insurance commissioner to avoid a confiscatory impact on an insurance company. It should also give the court a proper rate setting record, which is lacking in this proceeding. *See* the Pa. Casualty and Surety Rate Regulatory Act of 1947, 40 P.S. § 1181 *et seq.*

■ The attack on the legality of a statute is subject to a difficult burden. Every statute promulgated by the Legislature is fortified with a strong presumption of regularity and constitutionality. *See Illinois v. Krull,* 480 U.S. 340, 107 S.Ct. 1160, 1168, 94 L.Ed.2d 364 (1987). *See Terson Company, Inc. v. Bakery Drivers and Salesmen Local 194,* 739 F.2d 118 (3d Cir.1984). A court ruling on contested constitutionality must enforce the statutory provisions presented unless a finding of violation is plainly justified. Here, such a showing has not been made.

Keystone argues that the diminution in rates from now until July 1, 1990 is unconscionable. Even if true, the commissioner has agreed to take this factor into consideration in setting new rates, including not only an offset to the rate reductions but even a rate increase—although the need for an increase was characterized as "unthinkable." [7] N. 207 While it may be onerous, the evidence does not suggest that Keystone will be unable to weather this near-term financial storm. If the relief is not granted, Keystone can return to court, following appropriate proceedings.

■ Whether or not there are "extraordinary circumstances" entitling Keystone to relief under Act 6 is a decision that must originate with the Insurance Commissioner. It is not the court's province to adjudicate what should first be decided by an administrative agency. *Hodel v. Virginia Surface Mining and Reclamation Association,* 452 U.S. 264, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981); *First Jersey Securities, Inc. v. Bergen,* 605 F.2d 690 (3d Cir.1979), *cert. denied,* 444 U.S. 1074, 100 S.Ct. 1020, 62 L.Ed.2d 756 (1980). Only thereafter, if the dispute cannot be resolved administratively, should the court be called on to make the decision.

---

**6.** "As has been observed, however, '[h]ow such compensation may be ascertained, and what are the necessary elements in such an inquiry, will always be an embarrassing question.'" *Duquesne Light Company,* 109 S.Ct. at 616, quoting *Smyth v. Ames,* 169 U.S. 466, 546, 18 S.Ct. 418, 433–434, 42 L.Ed. 819 (1898).

**7.** In *Calfarm Insurance Company v. Deukmejian,* 48 Cal.3d 805, 258 Cal.Rptr. 161, 771 P.2d 1247 (1989), a rate rollback proposition was declared facially unconstitutional. There, however, relief was available only if the insurer was insolvent.

The familiar requirements for "the exercise of ... equitable discretion to grant a preliminary injunction [are] (1) the probability of irreparable injury to the moving party ...; (2) the possibility of harm to the nonmoving party ...; (3) the likelihood of success on the merits; and (4) the public interest." *Alessi v. Commonwealth of Pennsylvania*, 893 F.2d 1444, 1447 (3d Cir. 1990). Here, Keystone has not carried its burden of proving the probability of irreparable injury or the likelihood of the eventual success of its claim. Unquestionably, the public interest is at stake. Almost everyone agrees that a new direction in the insurance law is critically needed. If, as Keystone stresses, Act 6 is not a beneficial way to proceed, that will be known soon enough.

Because, as an ultimate proposition, legislation should be struck down only in clear and necessary cases and because it is not generally the court's function to become involved in the regulation of business activity or to interfere in administrative processes, such as insurance rate setting, the requested injunction has been refused by an order entered today.